ALEX G. TSE (CABN 152348)
Acting United States Attorney

BARBARA J. VALLIERE (DCBN 430353)
Chief, Criminal Division

CLAUDIA A. QUIROZ (CABN 254419)
ANDREW F. DAWSON (CABN 264421)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6488
    FAX: (415) 436-7234
    claudia.quiroz@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) | NO. CR 15-234 CRB |
|---|---|---|
| Plaintiff, | ) ) ) | **UNITED STATES' SECOND SUPPLEMENTAL SENTENCING MEMORANDUM** |
| v. | ) ) | |
| HRIPSIME KHACHTRYAN, TIGRAN SARKISYAN, | ) ) ) ) | Date: August 1, 2018
Time: 10:00 a.m.
Court: Hon. Charles R. Breyer |
| Defendants. | ) ) | |

## I.  INTRODUCTION

The United States of America hereby submits its second supplemental sentencing memorandum as to defendants Hripsime Khachtryan and Tigran Sarkisyan. During the initial sentencing hearing on June 14, 2018, the parties raised a series of issues, including whether the sentence recommended by the government and the Probation Office for defendant Sarkisyan—21 months in custody—would result in a sentencing disparity. In addition, the government argued that defendant Khachatryan has continued to engage in criminal conduct and should not be entitled to an acceptance of responsibility reduction.

UNITED STATES' SECOND SUPPLEMENTAL SENTENCING MEMORANDUM
CR 15-0234 CRB                                    1

Since the last sentencing hearing, the government has obtained additional information regarding Khachatryan's ongoing criminal conduct. The government submits this memorandum to address these issues ahead of the sentencing hearing, which the Court has continued to August 1, 2018. [1]

## II. ARGUMENT

### A. Sentencing Defendant Sarkisyan to a Term of 21 Months in Prison Would Not Result in a Sentencing Disparity

The need to avoid unwarranted sentencing disparities is indeed one of the sentencing factors the Court must consider. *See* 18 U.S.C. § 3553(a)(6). Specifically, Section 3553(a)(6) provides as follows: "The Court, in determining the particular sentence to be imposed, shall consider . . . the need to avoid unwarranted sentence disparities amount defendants *with similar records* who have been found guilty *of similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added). Defendant Sarkisyan attempts to contrast his conduct with the conduct of his co-defendant Maxwell Starsky, who also pleaded guilty to Racketeering Conspiracy and who was sentenced by this Court to 18 months in custody. Starsky and Sarkisyan do not have a similar record, however. Starsky has a prior conviction for disturbing the peace, which was resolved as an infraction under PC 415.[2] The Court found that his Criminal History Category was I. Sarkisyan, on the other hand, falls within Criminal History Category II as a result of a prior federal felony conviction in 2011 for interference with commerce by threats and violence, for which he was sentenced to 6 months in prison. *See* Sarkisyan PSR ¶ 50. Accordingly, Sarkisyan has a more serious (and relevant) criminal history and therefore does not have a record similar to Starsky.

Moreover, although both Starsky and Sarkisyan have pleaded guilty to Racketeering Conspiracy in Count One of the Second Superseding Indictment, their conduct was not at all similar. Starsky's conduct involved the illegal diversion of pharmaceutical drugs, which is what drove his loss amount. In his plea agreement, Starsky admitted the following conduct:

> Since at least 2014, I brokered transactions for McCarthy Wholesale LLC, where I obtained illegally diverted pharmaceutical drugs and sold them to

---

[1] The government will not repeat here its previous argument regarding Khacthryan's criminal conduct as to victim P.J. but incorporates them by reference.

[2] Although Starsky had an earlier felony conviction for making a false financial statement, that conviction did not result in any points.

> ME Wholesale Distribution LLC.  Additionally, I created false and fraudulent pedigrees to make it look like the drugs were purchased from legitimate sources, so that the drugs could be resold and redistributed to others.  In total, I provided approximately $1,227,500 of illegally obtained pharmaceutical drugs to ME Wholesale.  I also shipped and sent invoices for these drugs.  While working with McCarthy Wholesale, the company received multiple wire transfer payments totaling $1,227,500 for the drugs I brokered to ME Wholesale, and I personally received approximately $200,000.
>
> I also created the paperwork to re-establish a formerly defunct company, Medical Aspects LLC, for the purpose of being a straw-distributor of illegally diverted pharmaceutical drugs in New York.  Through Medical Aspects LLC, I created the fraudulent pedigrees for the sale of an additional $1,859,822 of illegally diverted pharmaceutical drugs to a buyer in New York.  In total, the loss amount I am responsible for is $3,087,322.

Maxwell Starsky's Plea Agreement ¶ 2.  Due to the quantity of illegally obtained pharmaceutical drugs involved in his offense, Starsky's loss amount was in fact significantly higher than Sarkisyan's (and Khachtryan's).

Starksy's Offense Level was 20 and his Criminal History Category was I, resulting in a Guidelines Range of 33 to 41 months of imprisonment.  The government recommended a sentence at the low-end of the Guidelines range—33 months.  During the sentencing hearing, the government emphasized the seriousness of the defendant's conduct.  Nonetheless, after Starsky made a compassionate plea about his family, the Court significantly varied downward and sentenced him to 18 months in custody.

Conversely, Khachtryan's and Sarkisyan's conduct centered around a tax check fraud scheme that involved the delivery of checks and supporting documents to facilitate the cashing of the fraudulently obtained tax checks.  These were tax checks issued to real victims.  Khachtryan and Sarkisyan unlawfully used the personal, private information of those victims, including copies of their driver's licenses, addresses, dates of birth, social security numbers, etc.  Moreover, the defendants did not merely provide a few names on one occasion—they did so multiple times, providing spreadsheets and a thumb drive containing the information of numerous victims.  In this sense, the defendants' conduct is more similar to their co-defendant Michael Inman, who was sentenced to 34 months in custody.  Inman's Guidelines Range was 30 to 37 months and the loss amount attributed to him was

$198,000. This amount is even lower than the loss amount of $261,277 attributed to Khachtryan and Sarkisyan. The Court imposed a sentence in the middle of the Guidelines Range for Inman because his conduct involved a real victim, albeit someone who trusted him.[3] Here, Khachtryan's and Sarkisyan's conduct involves **42 real victims**, as opposed to a single victim in Inman's case. Specifically, in his plea agreement, Sarkisyan admits to the following conduct:

> Since at least January 2013, co-defendant Hripsime Khachtryan ("Khachtryan") and I engaged in a tax check fraud scheme in which we knowingly and intentionally delivered to a confidential source ("CS"), whom we believed was a co-conspirator, supporting documents to facilitate the cashing of **42 fraudulently obtained tax checks**. These were United States Treasury checks that were obtained as a result of the filing of fraudulent tax returns by other members of the Enterprise. The supporting documents included photocopies of counterfeit driver's licenses and lists of individuals' names, addresses, birth dates, and social security numbers. These tax checks totaled $261.277.62, and we intended the checks to be negotiated by the CS. The total loss amount that I am responsible for is $261,277.62.

Sarkisyan Plea Agreement ¶ 2 (emphasis added). Although the number of real victims and loss figures attributed to defendants Khachtryan and Sarkisyan in their plea agreement were tied only to the tax checks they negotiated directly with the confidential source, the total amount of victims and illicit proceeds involved in their overall tax fraud scheme significantly exceed those amounts.

The government is by no means minimizing Starsky's conduct. He was involved in a serious offense and the government maintains that a variance was not warranted in his case. Similarly, a variance is not warranted in Sarkisyans' or Khachatryan's cases, particularly one motivated by the need to avoid a sentence disparity with a co-defendant with a different criminal record and who was involved in different criminal conduct.

**B.   Defendant Khachatryan Has Failed to Accept Responsibility By Continuing to Engage in Criminal Conduct**

In its Supplemental Sentencing Memorandum (Dkt. No. 1069), the government argued that bank records obtained from the Citibank account in the name of P.J., a resident of St. Rita's Haven (the health

---

[3] For several months during 2013, Inman participated in a scheme that involved stealing at least $198,000 in cashier's checks from his roommate ("L.C."), depositing those checks, opening fraudulent bank accounts in L.C.'s name, and writing and cashing checks from those fraudulent accounts.

care facility that Khachtryan owns and operates), demonstrated a series of suspicious deposits and withdrawals involving Khachtryan, her mother, and her sister.[4]  The government will not repeat those arguments here but maintains that those records are evidence that Khachtryan has taken advantage of an extremely vulnerable victim and engaged in money laundering and fraud involving that victim, who put her trust in St. Rita's and Khachtryan.

The government also argued that St. Rita's had taken control of the finances of another vulnerable patient, M.A., against his will.  Since the sentencing hearing on June 14, 2018, the government has received additional information relating to this victim, which it is providing to the Court under seal.  First, attached hereto as Exhibit A (under seal) is a recorded interview of M.A.  Starting at minute 8:24 and ending at around minute 11:13, M.A. discusses how St. Rita's has taken over his Social Security account and finances against his will.  Attached hereto as Exhibit B (under seal) is a Supplemental Report of Investigation by the Department of Health Care Services (DHCS) regarding an interview of M.A. on June 8, 2018.  That report summarizes the interview of M.A. at Northridge Hospital after he was hospitalized due to St. Rita's staff leaving the window open overnight and covering him with only one blanket.  Exhibit B.  Among other complaints, M.A. stated that Khachtryan blocked his access to his Social Security benefits and does not allow him to handle his money.  *Id.*  These allegations corroborate the evidence that Khachtryan has engaged in fraudulent activity with regard to P.J.'s finances.

In its supplemental sentencing memorandum, the government also noted that DHCS was investigating St. Rita's for fraudulent billing to Medi-Cal.  DHCS conducted an audit, which it completed on June 21, 2018.  That audit revealed that between January 1, 2012 and June 11, 2018, St. Rita's fraudulently billed Medi-Cal for 21 patients in the total amount of $343,618.  Attached hereto as Exhibit C is the final report of DHCS's audit of St. Rita's.[5]  The audit revealed that while St. Rita's billed Medi-Cal for "services provided" to patients in St. Rita's on certain dates, those services were

---

[4] Attached hereto as Exhibit D (under seal) is Exhibit B to the Government's Supplemental Sentencing Memo from June 14, 2018.

[5] Although part of the period of DHCS's review precedes Khachtryan's change of plea, it shows a continuity of overbilling that dates back to 2012 and that has continued to 2018.

actually not rendered because the patients were in the hospital at the time and not in the facility. Specific to the period following Khachtryan's arrest in connection with this case on May 6, 2015, the fraudulent billing figures between that date and June 11, 2018 amount to $151,485. Attached hereto as Exhibit C-1 is a breakdown of the post-arrest overbilling per patient between May 7, 2015 and June 11, 2018 (redacted to protect patient privacy).

Khachtryan is the owner and operator of St. Rita's. In that role, she is responsible for making decisions involving the business—both relating to patient care and billing to Medi-Cal. Accordingly, she is directly responsible for the fraudulent overbilling and mishandling of patient finances. With respect to defendant Sarkisyan, according to DHCS's review of St. Rita's records and on-site interactions, he similarly holds himself out to be substantially involved in the management and daily operations of the business.

### C. The Court Should Deny Defendant Khachatryan a Reduction for Acceptance of Responsibility Under U.S.S.G. § 3E1.1 Because She Has Continued to Engage in Criminal Conduct.

In the Ninth Circuit, a district court may consider continued criminal conduct as evidence of a lack of sincere remorse for the offense charged and, accordingly, deny a reduction under § 3E1.1. *United States v. Cooper*, 912 F.2d 344, 345 (9th Cir. 1990). In light of defendant Khachtryan's ongoing criminal conduct regarding the fraudulent handling of St. Rita's patient's finances and fraudulent billing to Medi-Cal, the Court should deny her the two-point reduction for acceptance of responsibility under § 3E1.1(a). Because the defendant does not qualify for a decrease under § 3E1.1(a), she is not eligible for a third point reduction under § 3E1.1(b).

Section 3E1.1 of the Sentencing Guidelines provides as follows:

> (a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels.
>
> (b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level **16** or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by **1** additional level.

1 U.S.S.G. § 3E1.1.

2   The Sentencing Guidelines require that the defendant "clearly demonstrate[] acceptance of responsibility for [her] offense." U.S.S.G. § 3E1.1(a). This determination is a factual one, with great deference given to the sentencing judge's determination. *United States v. Cooper*, 912 F.2d at 345 (citing to Application Note 5). In *Cooper*, the defendant pled guilty to bank fraud. It was later revealed, however, that four days before she entered her guilty plea, she fraudulently purchased a new car using a false name and false credit information, and continued to use fraudulently acquired credit cards. *Id*. at 345, 347. In light of this conduct, the Probation Office withdrew its recommendation of a reduction for acceptance of responsibility, which resulted in an increased offense level. *Id*. at 345. The Court followed the Probation Office's revised recommendation and denied the defendant the previously recommended reduction for acceptance of responsibility. *Id*. at 345-46 (stating that "defendant is not entitled to this reduction simply because she pled guilty. . . .[t]he burden is on the defendant to show sincere acceptance of responsibility . . . [h]er continued involvement in fraudulent activity belies that acceptance.") The Ninth Circuit concurred, finding that the court had "legitimately considered [this] evidence of continued criminal conduct … to belie [defendant's] professions of remorse and acceptance of responsibility for the offense of conviction." *Id*. at 348.

   A Court may negate a defendant's acceptance of responsibility regardless of whether a defendant's ongoing criminal activity was related or unrelated to the offense of conviction. As the Ninth Circuit court noted in *Cooper*, ongoing criminal activity *related* to the offense of conviction is sufficient to negate a defendant's acceptance of responsibility for the crime. *Cooper*, 912 F.2d at 346-48. In *United States v. Mara*, however, the court held that a district court may, in its discretion, consider criminal activity unrelated to the offense of conviction in evaluating whether a defendant has voluntarily withdrawn from criminal conduct for purposes of granting a sentencing reduction for acceptance of responsibility. 523 F.3d 1036, 1038 (9th Cir. 2008).[6] The Ninth Circuit held that because the defendant "engaged in continued criminal activity following his conviction, the district court did not err in

---

[6] In *Mara*, the defendant's "continued criminal conduct" was a jailhouse fight, whereas he had pled guilty to being a felon in possession of a firearm. *Mara*, 523 F.3d at 1037–38.

concluding that he had not demonstrated [ ] acceptance of responsibility," whether or not the continued criminal activity was related to the underlying offense. *Id*. at 1038–39.  *See also United States v. Rodriguez*, 357 F. App'x 54, 54–55, 2009 U.S. App. LEXIS 25315 *54 (9th Cir. 2009) (defendant was not entitled to the three-point deduction because of his intervening drug-trafficking conduct) (citing *Cooper*, 912 F.2d at 346); *United States v. Guidry*, No. 97-10274, 1998 U.S. App. LEXIS 20793 *3 (9th Cir. 1998) (finding that the district court did not clearly err in finding that "ongoing criminal activity is inconsistent with remorse.").

As set forth in the plea agreement, defendant Khachtryan's Total Offense Level is 13.  With a Criminal History Category of I, the resulting Guidelines Range would be 12 to 18 months of imprisonment.  This calculation included a three-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  In the plea agreement, Khachtryan agreed, among other things, "not to commit or attempt to commit any crimes before sentence is imposed or before I surrender to serve my sentence." Khachtryan Plea Agreement ¶ 10 (Dkt. No. 859).  Khachtryan also agreed to the following: "[I]f I fail to comply with any promises I have made in this Agreement, then the government will be released from all of its promises in this Agreement . . . but I will not be released from my guilty plea." *Id.*  Because Khachtryan has continued to engage in criminal activity following entry of her guilty plea, she is no longer entitled to the existing calculations in the plea agreement that include a reduction for acceptance of responsibility.  Accordingly, the Court should find that Khachtryan does not qualify for a three-level reduction for acceptance of responsibility under § 3E1.1 and sentence her pursuant to a Total Offense Level of 16, which results in a Guidelines Range of 21 to 27 months.

D.   **Government's Sentencing Recommendation**

In light of the aforementioned, the government reiterates its sentencing recommendation as follows:

1. **The Court Should Sentence Defendant Tigran Sarkisyan to a Term of Imprisonment of 21 Months in Custody**

U.S. Probation has calculated that Sarkisyan's Total Offense Level is 14 and his Criminal History Category is II, resulting in a Guidelines Range of 18 to 24 months of imprisonment.  Probation

UNITED STATES' SECOND SUPPLEMENTAL SENTENCING MEMORANDUM
CR 15-0234 CRB                                                            8

recommends a sentence of 21 months in custody, three years of supervised release, restitution in the amount of $261,277.62,[7] an expanded search condition, and a $100 special assessment. The government concurs with Probation's recommendation and believes that a term in custody of 21 months is sufficient, but not greater than necessary, to achieve the goals of sentencing.

U.S. Probation concluded that Sarkisyan poses a risk to reoffend. PSR Sentencing Recommendation at 2. In light of Sarkisyan's prior criminal history and involvement in St. Rita's, the government concurs with probation that a downward variance is not warranted in this case and that a custodial sentence of 21 months is appropriate.

### 2. The Court Should Sentence Defendant Khachtryan to a Term of Imprisonment of 27 Months in Custody

As set forth above, the Court should sentence Khachtryan to a term of 27 months in custody, which represents a sentence at the high end of the applicable Guidelines range without a reduction for acceptance of responsibility. Although there is a sufficient basis here for the government to argue for an upward variance under 18 U.S.C. § 3553 the government is simply asking the Court for a high-end sentence. As with Sarkisyan, the sentence should include restitution in the amount of $261,277.62, an expanded search condition, and a $100 special assessment. This sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing.

DATED: June 29, 2018

Respectfully submitted,

ALEX G. TSE
Acting United States Attorney

　　　　　/s/　　　　　
CLAUDIA A. QUIROZ
ANDREW F. DAWSON
Assistant United States Attorneys

---

[7] This amount is to be paid by Sarkisyan and his codefendant Hripsime Khachtryan, joint and severally. PSR ¶ 32.